UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

———————————————————————————————

LINDA MORTON,

                              Plaintiff,

              -vs-                                        07-CV-469-JTC

OTIS ELEVATOR COMPANY,

                              Defendant.

———————————————————————————————

APPEARANCES:   MICHAEL  V.  BOOTH,  ESQ.,  CANTOR,  LUKASIK,  DOLCE  &
               PANEPINTO, P.C., Buffalo, New York, Attorney for Plaintiff

               HARRY F. MOONEY, ESQ., and V. CHRISTOPHER POTENZA,
               ESQ., HURWITZ & FINE, P.C., Buffalo, New York, Attorneys for
               Defendant

By order of Chief United States District Judge William M. Skretny dated November 5, 2010 (Item 72), this matter has been reassigned to the undersigned for all further proceedings.

In this case, plaintiff Linda Morton seeks damages for injuries allegedly suffered while operating an elevator at Women and Children's Hospital of Buffalo ("Children's Hospital"), her place of employment, on August 30, 2004. The action was initiated in New York State Supreme Court, Erie County, by the filing of a summons and complaint on May 9, 2007 (Item 1, Ex. A), and was removed to this court by defendant Otis Elevator Company ("Otis") on the basis of diversity of citizenship of the parties. Following extensive fact and expert discovery, defendant filed a motion pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment dismissing the complaint (Items 57-4 ) or,

in the alternative, to preclude the testimony of plaintiff's designated liability expert for failure

to meet the standards for admissibility under Rule 702 of the Federal Rules of Evidence

and the Supreme Court's holding in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509

U.S. 579 (1993) (Item 57-5).

For the following reasons, defendant's motion for summary judgment is granted in

part and denied in part.  Defendant's motion to preclude expert testimony is denied.

## BACKGROUND

The following facts are adapted from the materials submitted in connection with the

pending motions.  On August 30, 2004, plaintiff was working at Children's Hospital as a

Nursing Assistant, assigned to the 6:00 a.m. to 2:00 p.m. shift in the Pre- and Post-Op

Surgical Unit located on the ninth floor of the hospital wing known as the Tanner Building.

At approximately 9:00 a.m. on that day, plaintiff was transporting a child patient from the

ninth floor to the surgery ward on the second floor, accompanied by the patient's mother.

The patient was on a wheeled bed, or "gurney," with a separate IV pole on wheels.  Plaintiff

called the elevator referred to as "Tanner 9- Surgical Elevator #5" (the "Tanner #5

Elevator") which is a key-operated elevator reserved for use by hospital staff for

transportation of surgical patients.

The Tanner #5 Elevator was originally installed in 1955, and was maintained by Otis

pursuant to a contract with Kaleida Health Services, Children's Hospital's corporate parent.

*See* Item 57-3 (Deft. Local R. 56.1 Statement), ¶¶ 3-4; *see also* Item 57-9 (Otis

Maintenance Contract, effective March 6, 2003).  On August 25, 2004, five days prior to

the incident alleged in the complaint, Otis installed a Lambda 3D door protection device

on the Tanner #5 Elevator, comprised of an interconnected series of infrared light beams across the elevator threshold which are triggered upon interruption causing the elevator doors to immediately stop and retract.  Item 57-3, ¶¶ 5, 6.

Plaintiff testified at her deposition that when the Tanner #5 Elevator arrived at the ninth floor on the day of the incident, the elevator door did not open right away.  She stated that she heard a "clanking, popping kind of noise" coming from the top of the elevator car.  She used her key again, and the door opened.  She noticed that the elevator floor was approximately three inches below the hallway floor.  She testified that she had noticed a similar mis-leveling of this same elevator earlier in the day, and had brought it to the attention of her supervisor and other hospital personnel.  She was told that an order had been placed for someone from Otis to come and take a look at it.  She also testified that she had experienced mis-leveling of this same elevator to a lesser degree on prior occasions, but she did not report this to anyone.  Item 57-21 (Pltff. Dep.), pp. 51-58; 60-66.

Plaintiff testified that when the elevator door opened on the ninth floor, the patient's mother stepped in first.  Plaintiff began to push the gurney slowly into the elevator while holding the IV pole with her right hand.  Suddenly the elevator door began to close, striking the pole.  The door reopened, and plaintiff was able to set the IV pole down while continuing to push the gurney into the elevator.  However, according to plaintiff, the elevator door then "slammed" into the  gurney, "crushing" plaintiff's left hand between the side rail of the gurney and the elevator door jamb.  *Id.* at 71-74; 84-90.

When the door reopened, plaintiff was able to maneuver the gurney into the elevator.  She used her key to close the door, but she heard the clanking, popping noise again, and the door stayed open.  She used her key a second time, and this time the door

closed and the elevator traveled to the second floor.  She used her key to open the door

on the second floor, but heard the same noise as before, and she had to use the key again

to get the door to open.  She left the elevator door locked in the open position, and

transported the patient to the surgery unit where she reported the incident to hospital

personnel.  *Id.* at 90.

As reflected by Otis Elevator's service and maintenance records, a service call to

Otis was placed on September 1, 2004– two days after the incident occurred– indicating

that the Tanner #5 Elevator was stuck on the ninth floor, with the doors closed, and was

not responding to calls.  The service record indicates that Otis mechanic William Schaber

responded to the call at 3:15 p.m. on September 1, and replaced a chain on the hoistway

door.  Item 69-10, p. 29.

In her complaint, plaintiff alleges that the "serious and permanent injury"[1] to her

hand was caused by "negligence and lack of care on the part of defendant," consisting of

the following:

> [n]egligent design, construction, manufacturing and/or installation of the . . .
> elevator; failure to properly maintain the subject elevator in a reasonably safe
> operating condition; failure to adequately inspect and maintain the subject
> elevator; failure to warn Plaintiff of the hazards associated with the subject
> elevator; failure to repair a known and defective condition existing thereat;
> carelessly and negligently failing to inspect the elevator and maintain said
> elevator to insure it complied with all applicable codes.

---

[1] Given the focus of the present motions, the record is devoid of proof regarding plaintiff's medical treatment following the incident at issue.  However, plaintiff testified at her deposition that x-rays taken two days after the incident revealed a fracture of her left thumb, which was treated by casting with no internal fixation, followed by a course of physical therapy.  She returned to work for a short time, but continued to experience pain.  Subsequent diagnosis revealed a severed tendon, requiring corrective surgery in October 2004, followed by a second surgery in September 2005 to address clotting and nerve damage. She testified that further complications have resulted in pain and numbness radiating to her shoulder and neck, requiring treatment with a pain management specialist, and leaving her totally disabled from work. *See* Item 57, Ex. L, pp. 104-24.

Item 1, Ex. A, ¶ 9.  Following answer and removal, and after an unsuccessful attempt at early mediation, the parties engaged in substantial discovery efforts, including the depositions of plaintiff and several employees of both Children's Hospital and Otis Elevator.  This was followed by designation and depositions of expert witnesses, including plaintiff's liability expert James Filippone, P.E., a licensed mechanical engineer employed by the Port Authority of New York and New Jersey, and defendant's liability expert William H. Woolford,  a licensed Qualified Elevator Inspector ("QEI").  *See* Item 57-2 (Atty. Decl.), ¶ 4.

Mr. Filippone and Mr. Woolford both inspected the Tanner #5 Elevator on June 12, 2008, and both reviewed the available information about the incident, including Otis's maintenance contract, manuals, and work records, as well as the deposition transcripts, documents, and other evidence produced during discovery in this action.  In his report dated October 7, 2009, Mr. Filippone expressed the following opinion as to what caused the malfunction of the Tanner #5 Elevator door on August 30, 2004:

> The door controller control box chain was excessively worn/slack before it broke causing it to skip/jump over the sprocket(s).  When this happened, the chain would make a clanking/popping noise, which is exactly what [plaintiff] heard before and after her incident.  This would cause the door operator control box switches (including the door open limit) to get out of sync with the actual position of the doors.  This would cause the door operation to malfunction, most likely on an intermittent basis.
>
> . . . .
>
> It is the opinion of the writer, within a reasonable degree of engineering certainty, based on the writer's observations, experience, and engineering analysis of the information available, that the primary cause of the incident was improper maintenance by Otis.

Item 57-30, p. 7.

In his report dated January 8, 2010, Mr. Woolford countered that Mr. Filippone's conclusions about the condition of the door operator chain as the cause of the door malfunction were "just pure speculation," with no supporting evidence.   Item 57-33, p. 3. According to Mr. Woolford:

> It is my conclusion and opinion that the elevator door operator and door protection device were functioning properly on 8/30/2004.   There are no records of any problems before or after this alleged incident.   The fact that the elevator continued with no problems until a call for service was placed 2 days later supports that opinion.   Someone would surely have observed a problem with the door operation in the process of moving patients from the 9th floor to the 2nd floor.   A loose chain or worn sprocket will not repair itself if in fact . . . it happened.   This is pure speculation as there is no record of faulty operation of the elevator to support this.
>
> . . . .
>
> It is my experience and opinion based on the records and information I have reviewed, the subject elevator was maintained and repaired properly.

*Id.* at p. 4.

Defendant has now moved for summary judgment dismissing the complaint, based on the following grounds:

1.      The available evidence shows that Otis had no actual or constructive notice of any mis-leveling or door malfunction problems with the Tanner #5 Elevator prior to the accident; to the contrary, defendant has produced substantial evidence showing that it performed several routine maintenance surveys and inspections on the Tanner #5 Elevator in the weeks preceding the incident which revealed no mis-leveling issues or door malfunctions of the type complained of by plaintiff.

2.      Plaintiff has not actively pursued her products liability claim, nor has she produced any evidence to show that the Tanner #5 Elevator, in operation at Children's Hospital for nearly 50 years, was defective at the time of its manufacture due to a mistake in  manufacturing, improper design, or inadequacy of warnings.

Defendant also moves to preclude Mr. Filippone from offering expert testimony regarding the cause of the accident.  These motions are addressed in turn.

## DISCUSSION

### I.      Summary Judgment Standard

Under Rule 56, "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  An issue of fact is material if it "might affect the outcome of the suit under the governing law . . . ."  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Id.*; *see also Hamilton Bank, N.A. v. Kookmin Bank*, 245 F.3d 82, 89 (2d Cir. 2001).

In reaching a summary judgment determination, the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party.  *Aetna Cas. and Sur. Co. v. Aniero Concrete Co., Inc.*, 404 F.3d 566, 574 (2d Cir. 2005).  The moving party bears the initial burden of establishing that there are no genuine issues of material fact.  *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970).  That burden may be satisfied by pointing out the absence of evidence to support the non-movant's claims.

-7-

*Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  Once this initial showing is made, the non-moving party may defeat summary judgment only by producing evidence of specific facts that raise a genuine issue for trial.  *Anderson*, 477 U.S. at 256; *Samuels v. Mockry*, 77 F.3d 34, 36 (2d Cir. 1996).  Mere conclusory allegations are insufficient and "[t]here must be more than a 'scintilla of evidence,' and more than 'some metaphysical doubt as to the material facts . . .'" to defeat a motion for summary judgment.  *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990) (quoting *Anderson*, 477 U.S. at 252, and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)), *cert. denied*, 500 U.S. 928 (1991).

The trial court's function at the summary judgment stage "is carefully limited to discerning whether there are genuine issues of material fact to be tried, not to deciding them.  Its duty, in short, is confined at this point to issue-finding; it does not extend to issue-resolution." *Gallo v. Prudential Residential Services, Ltd. P'ship*, 22 F.3d 1219, 1224 (2d Cir. 1994); *see also Keystone Manufacturing Co., Inc. v. Jaccard Corp.*, 394 F. Supp. 2d 543, 549 (W.D.N.Y. 2005).

## II.   Negligent Maintenance/Inspection

There is a substantial body of case law in New York[2] dealing with elevator-related negligence claims, establishing the general proposition that "[a]n elevator company which agrees to maintain an elevator in safe operating condition may be liable to a passenger for

---

[2]It is not disputed that the substantive law of negligence, as interpreted by the New York State courts, applies in this matter.  *See Klaxon Co. v. Stentor Electric Manufacturing Co.*, 313 U.S. 487, 496 (1941); *Donovan v. Centerpulse Spine-Tech Inc.*, 2010 WL 1269751, at *6 (W.D.N.Y. Mar 31, 2010), *aff'd*, 2011 WL 1086861 (2d Cir. Mar. 25, 2011).

failure to correct conditions of which it has knowledge or failure to use reasonable care to discover and correct a condition which it ought to have found." *Rogers v. Dorchester Associates*, 32 N.Y.2d 553, 559 (1973), *quoted in Carrasco v. Millar Elevator Industries, Inc.*, 758 N.Y.S.2d 679, 680 (App. Div. 2003). In such a case, the elevator company may meet its initial summary judgment burden by producing competent evidence in admissible form showing that the elevator "was functioning properly before and after the accident, and that, even if a defect existed, [the company] did not have actual or constructive notice of any such defect." *Lasser v. Northrop Grumman Corp.*, 865 N.Y.S.2d 301, 302 (App. Div. 2008) (citing cases).

If the defendant makes this showing, to defeat the motion the plaintiff must come forward with sufficient evidence to raise a triable issue as to whether the elevator company "either created or should have known of the defective condition that allegedly caused plaintiff's injury." *Solowij v. Otis Elevator Co.*, 742 N.Y.S.2d 836, 837 (App. Div. 2002) (expert's affidavit supported inference that Otis "did not conduct reasonably prudent inspections of, or competently maintain, the elevator in question," raising triable issue); *see also Rogers*, 32 N.Y.2d at 560-61 (circumstantial evidence, including Otis' expertise in elevator maintenance and prior reports of door malfunction, sufficient to permit jury to infer negligence); *Burgess v Otis Elevator Co.*, 495 N.Y.S.2d 376, 379 (App. Div. 1985) (jury could find actual or constructive notice of elevator's defective performance based on building manager's testimony regarding possible prior complaints of mis-leveling coupled with Otis' contractual undertaking to perform all inspection and maintenance), *aff'd*, 69 N.Y.2d  623 (1986).

Defendant cites several cases involving negligent maintenance and/or inspection claims made against Otis Elevator under circumstances similar to those presented in this case.  For example, in *Santoni v Bertelsmann Prop., Inc.*, 800 N.Y.S.2d 676 (App. Div. 2005), the plaintiff was injured when the doors of the elevator she was entering closed on her arm.  Otis was responsible for maintaining the elevators in the building where the plaintiff worked.  Plaintiff sued Otis for negligence, and Otis moved for summary judgment following discovery, relying on repair and business records, deposition testimony, and other evidence showing that Otis employees routinely inspected and serviced the elevator in question, and there were no other complaints or calls regarding problems with the elevator made around the time of the accident.  Otis also relied on the opinion of its expert witness, formed after post-accident inspection, that it was impossible for the elevator doors to have operated in the manner described by the plaintiff.  In response, the plaintiff relied on her expert's opinion–rendered without inspection of the subject elevator–that the most likely reason for the door malfunction was excessive carbon build-up on the relay contacts of the Lambda safety device (similar to the device installed on the Tanner #5 Elevator at issue here).  The Appellate Division found this opinion to be speculative since it was unsupported by any other evidence in the record indicating carbon build-up on the relay contacts, and therefore insufficient to create a triable issue of fact precluding summary judgment in Otis's favor.  *Santoni*, 800 N.Y.S.2d at 678-79.

Similarly, in *Skidd v. JW Marriot Hotels & Resorts*, 2010 WL 2834890 (S.D.N.Y. July 8, 2010), plaintiff sued Otis for negligent maintenance, seeking damages for injuries allegedly sustained  when the elevator he was riding in came to a sudden stop between floors as the result of an automatic loss of power caused by a  broken "selector tape."

Following removal to federal court, Otis moved for summary judgment based on its maintenance records, affidavits, and deposition testimony indicating that the elevator was properly maintained, and that Otis had no notice of any prior problems with the selector tape.  Plaintiff countered with the opinion of his liability expert that the selector tape broke due to excessive wear and tear that could have been addressed by preventative maintenance.  The court found this opinion to be "mere speculation" without evidentiary support, insufficient to preclude summary judgment in favor of Otis.  *Id*. at *5-6.  *See also Gjonaj v. Otis Elevator Co.*, 832 N.Y.S.2d 189, 190-91 (App. Div. 2007) (finding plaintiff's reliance on 5-year-old proof of prior accident "entirely speculative and insufficient to raise a triable issue of fact"); *Tashijan v. Strong & Assocs.*, 639 N.Y.S.2d 507, 510 (App. Div. 1996) (plaintiff's expert's "highly generalized and wholly speculative" opinion failed to correlate claimed deficiencies with mis-leveling event in question).

In this case, defendant relies on the same type of evidence as relied upon in the *Santoni*, *Gjonaj* and *Tashjian* cases to demonstrate that it had no actual or constructive notice of any mis-leveling or door-closing problems with the Tanner #5 Elevator prior to or reasonably contemporaneous with the August 30, 2004 incident.  For example, Otis has submitted its service and maintenance records for the period of one year prior to the incident through six months after the incident (Item 57-10), Children's Hospital's elevator inspection reports and work order records for the period between July and December 2004 (Item 59, and transcripts of the depositions of several Otis Elevator and Children's Hospital employees identified as individuals with knowledge or information pertinent to the maintenance protocol and usage of the Tanner #5 Elevator during the relevant time period (Items 57-14 through 57-27).  According to Otis, this proof shows that there were no

complaints or concerns of any kind with respect to the Tanner #5 Elevator car mis-leveling or the door abruptly closing or striking an object prior to August 30, 2004, and should be deemed by the court to be sufficient as a matter of law to establish that Otis had no notice, actual or constructive, of any of the problems with the functioning of the Tanner #5 Elevator that plaintiff claims caused her injuries.

For her part, plaintiff contends that there is substantial evidence in the record to raise a triable issue as to whether Otis had notice of the defective condition which led to the malfunction of the Tanner #5 Elevator doors.  Significantly, the same service and maintenance records relied on by Otis to show the absence of complaints about mis-leveling or door malfunctions actually reveal no less than eight service calls from Children's Hospital relating to problems with the Tanner #5 Elevator during the one-year period prior to August 30, 2004.  *See* Item 69 (Atty. Affirmation), ¶ 33.  The service calls primarily involved complaints about the Tanner #5 Elevator getting stuck on various floors with the doors either open or closed.  Otis service personnel responding to the calls reported that the problems were related to the "car controller" or "hoistway doors," and service performed included cleaning, adjusting or replacing contacts, wires, cables, and other hardware.  *See* Item 69-10, pp. 8, 9, 14, 16,  17, 19, 20, 21.  These complaints are also reflected in the deposition testimony of plaintiff and other Children's Hospital employees indicating that in the weeks and months preceding the incident at issue, several problems arose with regard to the operation of the Tanner #5 Elevator which were reported to hospital personnel and, ultimately, to Otis.  *See, e.g.*, Item 57-21 (Pltff. Dep.), pp. 57-68; Item 57-26 (Rucker Dep.), pp. 11-15; Item 57-25 (Pieszak Dep.), pp. 17-18.

As defendant points out, there is no information in the service and maintenance records to indicate that the prior complaints about the operation of the Tanner #5 Elevator were related to the specific malfunctions which caused the accident at issue–*i.e.*, mis-leveling and the doors closing too fast.   However, based upon the extensive proof in the record, and resolving all ambiguities and drawing all reasonable inferences in favor of plaintiff, the court cannot view the scope of causation so narrowly at the summary judgment stage.   Rather, as borne out by the opinion and testimony of plaintiff's liability expert, and considered in light of the undisputed fact that "Otis had undertaken, for a substantial fee, to handle exclusively all maintenance on the elevator," *Rogers*, 32 N.Y.2d at 561, this evidence could support the reasonable inference that the accident was caused by a malfunction of the Tanner #5 Elevator's door control unit due to wear and tear of the unit's "control box chain," and that Otis should have discovered this condition by virtue of its repeated service calls to address the recurring door closing problems.   As stated in *Rogers*:

> "Otis was hired because it knew elevators.   The jury may have reasoned that until Otis could come in and identify the cause (or all possible causes) and then show why this could not reasonably have been discovered, the failure of the expert to locate and correct the source of trouble showed neglect in the performance of the work in which it claimed pre-eminent competence.  . . . .
>
> "There was thus a solid basis for jury inference from circumstances which have a compelling attraction in the ordinary experience of men.   That was enough."

*Rogers*, 32 N.Y.2d at 559-60 (quoting *Otis Elevator Co. v. Robinson*, 287 F.2d 62, 65-66 (5th Cir. 1961)).

Based on this analysis, and upon review of the extensive evidence in the record with regard to the circumstances of the maintenance and inspection of the Tanner #5 Elevator,

the court finds sufficient support for a reasonable jury to infer that Otis had actual or constructive notice of a defective condition which could cause the elevator doors to malfunction in the manner alleged by plaintiff, creating a triable issue of fact precluding summary judgment in defendant's favor on plaintiff's negligent maintenance/inspection claim.[3]

## III.   Products Liability

Otis also moves for summary judgment dismissing plaintiff's claim based on negligent design, construction, manufacture, installation, and failure to warn of the defective condition of the Tanner #5 Elevator.   Defendant contends that this claim, sounding in products liability, cannot be maintained in this case because the record contains no evidence that the elevator was defective at the time of its installation in 1955 "due to a mistake in manufacturing, an improper design, or the inadequacy of warnings for its use . . . ."  *Fernandez v. Otis Elevator Company*, 772 N.Y.S.2d 14, 18 (App. Div. 2004); *see also Rosado v. Proctor & Schwartz*, 66 N.Y.2d 21, 25 (1985) (to establish *prima facie* products liability, plaintiff must show "that in relation to those who will use it, the product was defective when it left the hands of the manufacturer because it was not reasonably safe.").

---

[3]In her responding memorandum, plaintiff advises that she also intends to proceed under the alternative theory of *res ipsa loquitur*, essentially based upon the notion that the malfunction of the Tanner #5 Elevator which resulted in her injury is the kind of event which ordinarily would not occur in the absence of negligence.  In reply, defendant argues that the theory of *res ipsa loquitur* does not apply in this case, or in any case where the plaintiff was injured when struck by an elevator door over which he or she exercised some level of control.  The court need not resolve this issue since, as the New York Court of Appeals has long held, "[t]he principle that 'the thing speaks for itself' does not state a separate theory on which a plaintiff may recover for injury.  It amounts to nothing more than 'a common-sense appraisal of the probative value of circumstantial evidence' . . . ."  *Abbott v. Page Airways, Inc.*, 23 N.Y.2d 502, 512 (1969) (quoting *Galbraith v. Busch*, 267 N.Y. 230, 235 (1935)).

In response, and notwithstanding the extensive submissions made in connection with the present motion, plaintiff has failed to come forward with evidentiary support for her claim that the Tanner #5 Elevator was "appropriately designed, manufactured, and installed [inconsistent] with safety standards and the state of the art at the time of manufacture and sale." *Potaczala v. Fitzsimmons*, 568 N.Y.S.2d 983, 984 (App. Div. 1991).  In fact, in his expert report, plaintiff's own liability expert stated:

> Since the incident elevator was approximately 50 years old at the time of Ms. Morton's incident, improper design, manufacturing, or original installation of the elevator are unlikely causes of Ms. Morton's incident.  The mere passage of time would very likely have exposed any such defects a long time ago.

Item 57-30, pp. 3-4; *see also* Item 57-31 (Filippone Dep.), p. 19 ("Q: And I believe your report states that based on the age of the elevator, there's no manufacturing defect in this particular elevator.  Is that your understanding?  A: My understanding, correct.").  This concession is further substantiated by plaintiff's failure, in either her memorandum of law or anywhere in her attorney's 78-page affirmation, to address this aspect of defendant's summary judgment motion.

Accordingly, the court grants defendant's motion to the extent it seeks dismissal of plaintiff's claim brought under a theory of products liability based on negligent design, construction, manufacturing, installation, and/or failure to warn of the defective condition of the Tanner #5 Elevator.

## IV.   Motion to Preclude Expert Testimony

Defendant also seeks an order precluding plaintiff from offering the testimony of her liability expert, James Filippone, for failure to meet the standards for admissibility of expert testimony under the Federal Rules of Evidence and the Supreme Court's holding in

*Daubert v. Merrell Dow Pharmaceuticals*.   Defendant contends that Mr. Filippone's qualification as an elevator inspector does not give him the requisite expertise to render a competent opinion on the issues of elevator maintenance, and that his opinion regarding the potential cause of the accident is speculative, vague, and conclusory with no evidentiary support.

> Expert testimony is evaluated under Federal Rule of Evidence 702, which provides:
>
> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

Fed. R. Evid. 702.  In *Daubert*, the Supreme Court held that this rule "assign[s] to the trial judge the task of ensuring that an expert's testimony both rests on a reliable foundation and is relevant to the task at hand."  *Daubert*, 509 U.S. at 597.  As the language of Rule 702 indicates, this "gatekeeping" function applies not only to scientific expert testimony, but also to technical and other specialized knowledge, such as the "discipline of engineering," which is the type of expert testimony proffered by Mr. Filippone in this case.  *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 147-48 (1999); *see also Pinello v. Andreas Stihl Ag & Co. KG*, 2011 WL 1302223, at *7 (N.D.N.Y. Mar. 31, 2011).

In performing this gatekeeping function, the district court must determine as a threshold matter whether the proposed witness qualifies as an expert, "that is, whether the proposed witness has the specialized knowledge, skill, experience, training, or education that would assist the trier of fact in understanding the evidence or deciding on particular

issues in the case." *Solorio v. Asplundh Tree Expert Co.*, 2009 WL 755362, at *2 (S.D.N.Y. Mar. 23, 2009) (citing *Aspex Eyewear, Inc. v. Altair Eyewear, Inc.*, 485 F. Supp. 2d 310, 318 (S.D.N.Y. 2007)).   If this threshold requirement is met, then the court must determine whether the proffered testimony is both relevant and reliable.   *See Baker v. Urban Outfitters, Inc.*, 254 F. Supp. 2d 346, 352-53 (S.D.N.Y. 2003).

As outlined in his "Expert Affidavit" (Item 69-14), Mr. Filippone is a Professional Engineer, licensed in New York and New Jersey.  He holds a Bachelor of Science Degree in Mechanical Engineering from Manhattan College, and a Masters of Science Degree in Management from Polytechnic University in Brooklyn.   He is certified as a Qualified Elevator Inspector ("QEI"), and is a member of the Elevator and Escalator Safety Code Committees for the American Society of Mechanical Engineers ("ASME").  He has been employed as a mechanical engineer for the Port Authority of New York and New Jersey since 1986.   Currently he holds the position of Senior Mechanical Engineer with responsibility for evaluation, inspection, and testing of mechanical equipment to ensure proper installation, operation, maintenance, and code compliance for over 650 elevator units at Newark, Teterboro, Kennedy, and Laguardia Airports, the George Washington Bridge, the Lincoln and Holland Tunnels, and various other facilities under the auspices of the Port Authority.  He is co-author of the publication, "Elevator and Escalator Accident and Reconstruction and Litigation" (2002), which specifically deals with forensic investigations of elevator accidents.

In the court's view, these listed qualifications, considered in conjunction with the substance of his deposition testimony, provide an ample basis to conclude that Mr. Filippone possesses knowledge, skill, experience, training, and education that would assist

the trier of fact in understanding the evidence and issues in this case regarding the operation and maintenance of the Tanner #5 Elevator.  Defendant's contention that Mr. Filippone should not be permitted to provide expert testimony in this matter because he is an elevator *inspector* with no relevant experience as an elevator *mechanic* is, frankly, unavailing.   Clearly, Mr. Filippone's long career as a mechanical engineer with responsibility for the inspection, operation, and maintenance of the Port Authority's elevators, as well as his sworn affirmation of familiarity with Otis Elevator's maintenance protocol and the specific components of the elevator at issue in this case (*see* Item 69-14, ¶¶ 6-7, 10-11), provides a "sufficient nexus between the witness's expertise and the subject about which he intends to testify."  *Rabozzi v. Bombardier, Inc.*, 2007 WL 951569, at *5 (N.D.N.Y. Mar. 27, 2007).  That his experience with the internal workings of the mechanical components of elevators was gained through his work as an inspector rather than as a mechanic goes to the weight of his testimony, not its admissibility.  *See Pinello*, 2011 WL 1302223, at *8 (expert with significant engineering experience designing and testing power equipment qualified to testify regarding hazards associated with operation of handheld pipe cutting machine, despite lack of experience with machine at issue); *Humphrey v. Diamant Boart, Inc.*, 556 F. Supp. 2d 167, 176 (E.D.N.Y. 2008) (expert qualified to testify regarding design of blade guard on power saw based on general and specific engineering experience with "machine guarding," despite lack of experience with power saws).

With respect to relevance, expert testimony, like any proof, will be considered relevant if it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without

the evidence." Fed. R. Evid. 401; *see also Aspex Eyewear*, 485 F. Supp. 2d at 319.

Certainly, Mr. Filippone's opinion regarding the possible cause of the elevator door

malfunction resulting in plaintiff's injuries, if credited, meets this liberal standard.

Defendant's primary challenge to Mr. Filippone's testimony rests on the reliability

prong of the Rule 702 inquiry. In conducting this inquiry, the court considers "the indicia

of reliability identified in Rule 702 . . . : (1) that the testimony is grounded on sufficient facts

or data; (2) that the testimony is the product of reliable principles and methods; and (3) that

the witness has applied the principles and methods reliably to the facts of the case."

*Aspex Eyewear*, 485 F. Supp. 2d at 319 (citations and internal quotations omitted). As the

Second Circuit has instructed:

> Although expert testimony should be excluded if it is speculative or
> conjectural, or if it is based on assumptions that are so unrealistic and
> contradictory as to suggest bad faith or to be in essence an "apples and
> oranges comparison," other contentions that the assumptions are unfounded
> go to the weight, not the admissibility, of the testimony.

*Boucher v. U.S. Suzuki Motor Corp.*, 73 F.3d 18, 21 (2d Cir. 1996) (quoting *Shatkin v.*

*McDonnell Douglas Corp.*, 727 F.2d 202, 208 (2d Cir. 1984) (other citations and internal

quotation marks omitted). "[N]othing in either *Daubert* or the Federal Rules of Evidence

requires a district court to admit opinion evidence which is connected to existing data only

by the *ipse dixit* of the expert. A court may conclude that there is simply too great an

analytical gap between the data and the opinion proffered." *General Electric Co. v. Joiner*,

522 U.S. 136, 146 (1997).

Defendant contends that Mr. Filippone's opinion regarding the cause of the

incident–specifically, that the "control box chain" on the Tanner #5 Elevator's door

controller device failed due to excessive wear and tear resulting from insufficient preventative maintenance–is unreliable as a matter of law because there are no facts in the record to support it.  According to defendant, it is demonstrably apparent that it was the "hoistway door chain" that failed and was replaced by the Otis mechanic two days after the incident, not the "control box chain" on the elevator door controller.

However, the court's review of the record indicates that Mr. Filippone formulated his opinion after an in-depth inspection of the mechanical components of the Tanner #5 Elevator, and upon thorough review of the extensive deposition testimony and other evidentiary materials produced during discovery in the case.  His theory about the failure of the control box chain was based in significant measure upon plaintiff's testimony that she heard the same loud "clanking, popping" noise coming from the top of the elevator car when the elevator doors failed to immediately open on both the ninth and second floors, supporting the inference that the problem was with the operation of some mechanical component of the door controller device located on top of, and traveling with, the elevator car, as opposed to the operation of the hoistway door on the ninth floor.  In addition, defendant's liability expert William Woolford testified that, assuming plaintiff's testimony to be true, the noise she heard coming from the top of the elevator car on the second floor could not have been caused by the broken chain on the ninth floor hoistway door, but it could have been caused by slippage of a worn control box chain in the door controller on top of the elevator car.  *See* Item 57-34 (Woolford Dep.), pp. 107-11.

Based on this review, the court finds that plaintiff has demonstrated a sufficient connection between the evidence presented in the case and  Mr. Filippone's conclusions regarding the specific cause of the door malfunction which resulted in plaintiff's injury.

-20-

Defendant's contentions about the reliability of these conclusions "go to the weight, and not the admissibility, of the testimony." *Boucher*, 73 F.3d at 21.  As the Supreme Court recognized in *Daubert*, "[v]igorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Daubert*, 509 U.S. at 596; *see also Borawick v. Shay*, 68 F.3d 597, 610 (2d Cir.1995) (*Daubert* "advanced a bias in favor of admitting evidence short of that solidly and indisputably proven to be reliable."), *cert. denied*, 517 U.S. 1229 (1996).

Accordingly, defendant's motion to preclude Mr. Filippone's expert testimony is denied.

## CONCLUSION

For the foregoing reasons, defendant's motion for summary judgment (Item 57) is granted to the extent it seeks dismissal of plaintiff's claim sounding in products liability based on negligent design, construction, manufacturing, installation, and/or failure to warn of a defective condition, and the motion is denied in all other respects.

Defendant's motion (Item 57) to preclude the testimony of plaintiff's liability expert, James Filippone, is also denied.

A telephone conference with the court is scheduled for Monday, July 11, 2011, at 2 p.m., to discuss further proceedings in the case.  The court will initiate the call.

So ordered.

_____/s/ John T. Curtin_____
JOHN T. CURTIN
United States District Judge

Dated: June 3, 2011
p:\pending\2007\07-469.apr12.2011

-21-